There are a lot of issues in this case and I would welcome the court's direction about what you would like to hear about but I would like to start with enablement in particular with the question of whether the patent enables the production of a particular version of the device in which a monocrystalline GAN growth layer is grown directly on an amorphous GAN buffer layer. Our expert explained that there are... Let me just ask you about that because we don't have that much time. There are a number of arguments in response to your position. One of them is that you don't really have to enable all of the permutations. There were like six permutations and this is just one of the six. You agree that that's the case, right? This is just one of six permutations or however many? That is correct. Okay. So what is your response to what is I guess a legal question about whether or not all of them have to be enabled? This court has said time and time again that the patent has to enable the full scope of the claims and that only makes sense. There's no question that if each of these devices have been claimed separately, they would have to enable each claim or if each had been claimed in a different patent, it would have to be enabled in each patent. There's no reason they should be able to get around that obligation. Are you talking about the claims here or permutations of the different embodiments? We are talking about permutations of a particular claim, an embodiment of a particular claim. But my point is... All permutations of the claims have to be enabled? Yes. Well, there can be circumstances where that's not exactly the case. It's kind of apples and oranges. If you've got these genius species claims, at least there's at least one non-crack opinion that I think the other side cites that says, you know, if there are a thousand possibilities here, you don't have to enable each and every one of them distinctly. I think what that case says, and it's consistent with the general case law, is you don't have to give a recipe for the creation of every permutation, but you have to say enough to enable somebody who is skilled in the art using what is taught in the patent, what they know and reasonable experimentation to create every version of the claimed device. So there can be gaps in the recipe and the faceta fills in those gaps. Exactly. How did that happen here? What happened here is... Let me talk about the two problems that we've identified. One is the griddle effect. Our expert, Dr. Fitzgerald, testified that the only way you can crystallize the growth layer is by getting a lot of heat to it. He testified without contradiction that the only way the patent teaches to do that is to heat the substrate, thereby sending that heat through the buffer layer up to the growth layer. So the buffer layer is never going to be cooler than the growth layer. As a consequence, because the two layers are made of the same substance, they're subject to the same amount of heat for the same amount of time, he says if you crystallize the growth layer, you're necessarily going to create crystals in the buffer layer. Or conversely, if you find some way to avoid crystallizing the buffer layer, you're not going to get enough heat up to the top layer to crystallize the monocrystalline buffer layer. And that argument essentially went unrebutted. Dr. Piner, their expert, explained that it might be possible to avoid crystallizing the amorphous buffer layer following the directions that the high temperature set. But he never went to the next step and said what would happen to the growth layer if you did that. And he never claimed that if you somehow kept the buffer layer thick enough, cool enough, and heated it a short amount of time enough to keep it from crystallizing, you would somehow nonetheless crystallize the top layer. Now Dr. Moustakis talked about epitaxial overgrowth. But that testimony, I think, only confirms our understanding of the resulting structure. And I think it's helpful. He's asked directly by his own counsel at page 2248 of the joint appendix what the resulting structure of epitaxial overgrowth will be. And it's short enough and important enough I'd like to read it to you. He's asked at line 8, question, so you go from amorphous, yes, question, to polycrystalline, yes. And so then that is where the buffer comes in between the sapphire. That's correct. And here's the critical question. And then ultimately you have the amorphous, the polycrystalline, and on top of that, that is on top of the polycrystalline, the survival of the fittest and you get a near-intrinsic monocrystalline layer. That is correct. And that testimony is consistent with the testimony from the inventor and from Dr. Fitzgerald. Can I ask you a question? I want to stay on enablement, but this has to do with the time construction and that the interpretation has grown on. My question isn't to ask you to talk about why grown-on should include direct and indirect, but my question is, regardless of what we do with grown-on, your enablement argument stands, right? That is correct. Because grown-on, everyone agrees, at least requires directly. And that is the limitation that is the directly embodiment is one of the ones that you're talking about that is not enabled. That is correct. That's enabled. In fact, if we were to change the construction to require directly, then instead of six embodiments, one of which is not enabled, we'd have three embodiments, one of which is not enabled. That is exactly correct. To return to the point about the amorphous buffer layer, the other point that our expert made was that this method, that this patent teaches how to create the devices through the tools and techniques of epitaxy in which you are laying down material one layer on top of another. Well, some of their testimonies suggested that you could do it and they weren't using the epitaxy, right? And your view is that the specification is clear that that's what we're talking about here? Well, let me answer it in two ways. It is correct that they say that you can create this through non-epitaxial means. What they have to show, though, is you can create it through non-epitaxial means that are taught by this patent. And they never bridge that gap. I understand, because you're saying all the specification and all the discussion is only through the patent. Well, it's not just about that. When they talk about being able to do this, there are two pieces of testimony. Dr. Piner says he did it in nine years after the application, so it's irrelevant for that reason alone. But he doesn't describe how he did it. And he certainly doesn't say that he did it through the means, whatever you call them, described in this patent. Or without undue experimentation. Or without undue experimentation. Which is the standard. Exactly. I mean, the mere fact that it occurred nine years later doesn't necessarily imply it took a lot of experimentation to get there, but it also doesn't imply the opposite, that it was easy to do. His testimony did say you could realize it without much experimentation, but I assume your argument about that testimony is it's conclusory and it doesn't explain how that is, though. That is correct. And Dr. Moustakis also says that he created... And you're arguing that we don't know how those results were achieved, period. We don't. He didn't say. Now, Dr. Moustakis, when he says he did it six years later, also irrelevant, he at least explains how he did it. But he explains that he did it by etching the amorphous layer with acid, which is nowhere mentioned in this specification. He doesn't claim that he was following the specification either. Which is particularly remarkable, because we have a written description argument here in this case, which asserts that he didn't possess this version of the device at the time of the application. You would have thought he would say, it's possible, and in fact, I did it in 1991. Instead he says, it's possible I did it in 1998, and through a different method. Back to the beginning where we started, which is that this is one of six possible embodiments that this claim would cover, and five of the six are undisputedly enabled, but there's one that's arguably not enabled. Assuming we agree with you that it's not enabled, you don't have to win, do you, on the idea that everything in a claim must always be enabled? You don't have to fight that battle. I mean, you started by saying, suggesting that our case law suggests everything has to be enabled. That's right. I mean, the larger the genus, or the larger a range in a claim, the less comfortable I get with the idea necessarily that every single thing has to be enabled, but when a claim only covers six discrete embodiments, isn't that at a minimum a place where we could draw a line and say, in a nice little opinion, something like, you know, even without deciding whether every embodiment would always have to be enabled, when there is such a limited number that are included in a claim, that limited number does. Absolutely. You don't have to go any farther than that. Now, just to be clear on our position, because we think that it doesn't enable any amorphous layer at all, in fact, it's our position that only three of the six are enabled, but the one we've been talking about is. I'm sorry, can you just clarify, is that just to Judge Moore's point that if the claim construction were incorrect, then you would only have three? No. Okay, then what? We have a separate argument that says, when you look at the patent, and it talks about the two-step process, every time it talks about the second process and talks about the crystallinity of the resulting buffer layer, it says that at that higher temperature process, you can or you will crystallize it. And so that, if that's right, that eliminates half the embodiments. But even if that's wrong, even if you don't accept that, the griddle effect argument eliminates the possibility of creating the mono directly on amorphous, and that's all we need in order to win this case. If I could just ask you about, move on to just one other quick point about the foreign sales argument you made. It's not clear to me what you're asking us to do about the foreign sales stuff. I mean, the district court really hasn't opined on that. You've still got potential trial on damages, so what is it exactly that you want us to do about that? We would like you to say that there is insufficient evidence to sustain infringement liability with respect to those sales, such that at the damages redrawal, assuming there is one, the jury will simply be instructed to assess damages on the basis of the U.S. sales alone. There's a risk that if you don't do that, that we'll go back down to the district court. Yeah, but that's an advisory opinion. I mean, just by the fact that you characterize it as a risk, you're right. I mean, the district court hasn't said anything contrary. We don't have the evidence in front of us. It seems a little premature or advisory for us to be kind of opining on a legal issue that may not even end up being an issue, right? Because the district court has not said all of these foreign sales ought to be included in damages. Well, with respect, she did say that. We raised this in our Rule 50 motion. She denied the motion. She didn't give any reasons, but she denied the motion and allowed the jury to be presented with the evidence of all of those foreign sales, which are the vast majority of the sales that accounted for the verdict against Epistar on direct infringement. And so I think she did deny our motion. It had a consequence in the verdict. It will have a consequence again in the retrial, unless you tell the court you have to exclude those sales from the royalty base. You know, it's possible. How do we know the jury didn't exclude them? Excuse me? How do we know that the jury did not exclude those sales? Well, because it's a lump sum verdict, we don't know that it did or didn't, but the point of a Rule 50A motion is to say that this evidence ought not to go to the jury or this issue ought not to go to the jury in the first place. So it's possible that the jury didn't consider it, but on the retrial, it's possible that they will. And we are just asking you to make clear to the district court that the jury has to be limited to awarding damages on infringement that actually falls within the scope of the Patent Act. And I don't think, I'm sorry, I thought I heard a question. I apologize. Can I move quickly to claim construction? Sure. And that is... You're in your rebuttal, but quickly then. Let me say very quickly three points about this. One is the district court's reading basically reads the word grown out of the term grown on. They could have achieved the same result with just on. The word grow itself naturally implies direct connection. That's why we say mold is grown on bread rather than mold is grown on the plate that's under the bread. This specification, every time it talks about how you accomplish grown on, talks about depositing a material on the substrate. It talks about exposing the substrate to the material, which also strongly implies direct contact. None of the examples ever discuss an intervening layer between the substrate and the buffer or between the buffer and the growth layer. The closest it comes is when it talks about there being two growth layers. And in that context, it doesn't talk about the first, the second growth layer being grown on the buffer layer. What about the argument that the word comprising appears in the claim? Therefore, that broadens it. It broadens it means that there are some unrecited elements in the device, but there wouldn't be elements that are precluded by an appropriate reading of the other claim terms. I think, to be frank, that their stronger argument is that this allegedly reads out a preferred embodiment, but the premise for that canon is simply not present here because you ordinarily apply that canon because you assume the author wouldn't have written the claims in a way he knows will exclude a preferred embodiment. And in this case, it's undisputed that the inventor did not know that, you know, this very contestable proposition that sputter etching would create something that somebody might think of as an intervening layer. And as a consequence, there's no premise for applying that canon here. To what extent is enablement and written description tied together? If we affirm on enablement, is there still a written description problem? They are distinct. If you affirm on enablement, yes, you have to ask for written description because the difference is enablement can be overcome by reasonable experimentation. Written description cannot. The question is, did he possess this? Not that could somebody else have created it through additional experimentation beyond what is disclosed in the patent. And here, there's no evidence that he possessed these versions of the device at the time. Every description of the buffer layer is a crystalline buffer layer. And as I explained, the only evidence that it's even possible to create a monocrystalline directly on amorphous comes from his additional six years of experimentation by him and others. If I could reserve the remainder of my time. Thank you, Your Honor. And may it please the court, Ed Reines on behalf of BU. Just going right to enablement, which is where we spent most of the time. The jury and the district court got the issue right. And we would ask the court to find the same. The burden to establish an enablement lies with the party attacking it. This is after a jury trial. And that's a question of law. It's a question of law based on underlying facts where the facts are all assumed to be found in favor of the court. And the district court was kind of iffy on this too, right? I mean, did she not consider this a close call and kind of was a little tentative, she thought? I took it the other way, which is that it wasn't a close call whether J-Mal should be appendix of 20. She said both experts at a trial. And then whether the ultimate question was right or not was a close call. That's classic for when an affirmance is appropriate. So you have the judge that was sitting through the complex trial about difficult technology who says, we heard experts on both sides. And that's where we ended up. There was no Wands analysis. The demonstration of the enablement was basically the expert for the opposing side went through and applied one of the examples and said, under this example, an amorphous. So where is the, okay, so I know you started to go there. But exactly, can you point us to where the evidence is? You're not arguing here today that they didn't have to enable the sixth, what we've been calling the sixth permutation, right? So that's at 8-12 where the district court says that a case deal has already resolved, that you don't have to do every permutation. It's not as though a more- So are you resting on that? That's your position? I'm not resting on that. I mean, this is a situation where the verdict was in our favor and the district court denied J-Mal. So I'm resting on that in the first instance, obviously. But if we disagree with that premise, at least as Judge Moore pointed out in the context of this case, when there were a total of six possible permutations at most, where does that leave you in your case? That leaves me with the verdict in my favor and the district court who sat through it determining that it was a close question with experts debating it. But the point I want to make is there's very strong authority from this court, Cephalon, Union, Carbide, and Streck, that says you don't change enablement as a matter of law based on just statements of undue experimentation or something. There was no one's analysis. Our witnesses came in very clearly, this A22269. So if you follow these sorts of boundaries within the teachings of the 738 patent, you could realize with not much experimentation, the type of structure we're talking about here, namely the amorphous buffer, some sublayer, and then monocrystalline. The burden was on them to then cross-examine him. Why? When? How come not? The whole premise of the opening presentation was as though we had the burden to prove enablement rather than they failed to carry their burden of establishing it wasn't. Yeah, but okay, I take your point. But if you're looking at another question, which we're at the point where you've got to tell us something, this isn't this quintessential entirely conclusory testimony. No, and I think if you look at Cephalon and Union, Carbide, and Streck, what they find is that this kind of testimony supports a judgment. If the opposing side thinks that this is superficial or otherwise, it's their responsibility. Keep in mind, it's not as though these witnesses didn't cite references. They said, here, I happened to do it in 1998. Here's the reference. That's in the record. That's not conclusory. But you're suggesting they didn't put on a case. Of course, they put on a case. They had their own expert who opined as to why this wasn't enabled. No, I'm responding to the conclusory point. It wasn't conclusory in that both experts said, I did this. Because their argument at the time is, I did this six years later. So how is that probative of anything? Because our technical expert didn't use the invention before it was invented. This is a pioneering invention that everybody recognizes as being pioneering. The art developed after the person did it. Obviously, people weren't doing this before the invention. We had to enable it at the time. No doubt. You can't say it's enabled irrespective of... No doubt. But keep in mind, the case they made, and you heard a bit of this, was one of technical impossibility. It was essentially, the temperature makes it so that you can't possibly do it, right? That's probably what appealed to... Well, they can't do it through the means disposed in the patent. But other people were able to do it by etching and other processes, many of which don't seem to me to be disclosed by the experts in the testimony here, how they ultimately were able to do it four years later or six years later. Right. And so, very fair question. And I think really, there's a few things about that. One is, all they said is, we followed the embodiment, and this wouldn't work under the embodiment. Okay? I think we can agree, that's too narrow, right? You can't just say, I use the embodiment, and it's a preferred embodiment that uses polycrystalline. It's not amorphous. No one's saying it is. Right? So that's the limits of what was presented. Then our people come back, and it was essentially, this is technically impossible. Our people came back to witnesses and said, it's not technically impossible. We did it, of course, after the invention. We didn't do it before the invention. We were focused on polycrystalline. It is claimed as monochrome. We did it after the invention, but we don't know how they did it. And what we do know is, they didn't do it according, most likely, they didn't do it according to the manner taught in the patent. Right. That's right. So that turns on, does every single permutation need to be disclosed by recipe in the specification? Right? But it has to be known to a skilled artisan at the time. And what cuts against you is the idea that six years later, they told us they were able to do it, and the only process we know of by which they were able to do it is this etching process. What we don't have is testimony suggesting that that would have been known at the time. Right. So if I was appealing, if I was on this side of the table, that would be a big problem for me. But they came forward and said, if you use the preferred embodiment, which is a polycrystalline one, the temperatures that you use and the time that you use isn't going to work. It's not broader than that. That's all they said. Our people came back and said, and with this implication that it was technically impossible. Our people said, we did it. It's not technically impossible. It's not our burden then, I don't think, to show a full case with clear and convincing evidence that it was known. It was their responsibility at that point. This is what I think Cephalon, Union, Carbide, and Streck show. Theirs to say, well, when did you do it? Why did you do it? Were those techniques known? That's just how I see the burden shifting. That's how I've seen this court apply the burden. The jury found it in our favor, and the judge validated it. I'd like to move on to Grown On, given the shortness of time. I think the most important thing about Grown On is that in the art, the term Grown On is used to mean position above the substrate. We know that from the cited prior art. We've collected that on our brief at 44, where reference after reference refers to an ALN buffer layer being between the gallium nitride and the substrate, and always refers to it as Grown On. It's page 44 of the BU opening brief. What's important about these is that two of these are cited prior art. This is just to use a positional thing. There's no reason to believe otherwise. That's what the district court judge found, and it deserves finding of fact deference. I think a broad construction here of this pioneering invention is appropriate. Did she find that as a matter of fact somewhere based on this prior art? Did she cite it and include that in her fact finding? She focused on the fact that their expert had a patent. Any citations of this prior art in her opinion? What she said, she focused on their expert. She used it that way too. Their expert had a patent, and she said even their experts using the term Grown On in this broad way. Yeah, but you just said she's entitled to deference for her finding about what these prior art references disclosed, and I don't remember- Oh, no, I didn't. If I said that, I misspoke. I did not mean that. The finding of fact was that Grown On was used in this broader way. By the expert? I think by the expert, yeah. But not- In the art. Not founded in- In the art is a different thing. Where can I see her fact finding on this? Her fact finding is 252, which is page 21 of her claim construction opinion. Dependent's expert is named as an inventor, describes a layer grown on a substrate that does not in fact contact the substrate. I'm sorry. I'm at 252. 252. It's about a third of the way down the page. Okay. And you said defendant's expert, furthermore a recent patent in which defendant's expert? Yes, exactly. Okay. All right. And then I'd like to move to our appeal, our cross appeal if that's okay, unless there's more questions. I don't think you should do that yet. Go ahead. Okay. No, no, no. I was going to move on from this. Oh, go for it. Okay, go ahead. No, I was going to ask you about the foreign sales point. Right. Just to make a quick point on that. Yes. So on the foreign sales point, the law is that there's no one formula that you generally take into account all the location of the performance and of the agreement. So it's just there's no real formula. That's just the way the law is. And in this- I'm sorry. No real formula for what? Whether or not- Determination. The sales are included or excluded in the calculation? Yes. It's very factual and there's a number of relevant considerations and they haven't even all been enumerated. They haven't been enumerated in our case law or in this case? That's correct. In the case law. It's just the way the case law is developed. This is HALO. HALO really is the best one to and it talks about, well, it's not necessarily where the products are shipped. It's not necessarily where the agreement is entered into as a legalistic matter. It's an overall appreciation of contacts with the U.S. That's what it is, believe it or not. And here, the purchases were made from the U.S. Payments was made from the U.S., which is performance. We're not going to litigate it here at this trial, the argument. So your point is what? You have your damages trial. That is a portion of the trial and that will be litigated in that context? I mean, I assume that it will be litigated or the verdict will be interpreted one way or the other. But at a minimum, the verdict is supported by the U.S. Shipments. Before we go to the cross-appeal. Okay. Thank you. On the cross-appeal, I'll summarize it. With respect to the enhanced damages and the willfulness, for both of those, there's two essential problems. One was the reliance on attorney-client privilege, the reliance on an opinion letter that clearly shouldn't have happened. It wasn't used during the main trial and then it got used later. And you're not allowed to do that. And that was the central basis of denial. In addition, the court found that they had that the... A central basis, I think. Okay. It wasn't the central basis. No. But I mean, I think that led to the conclusion that they had a good faith belief, which probably if we were saying the, was the central basis. And with respect to that central belief... He's got a lot of discretion in these areas. No doubt. But relying on the reliance on counsel when the other side's refused and you've got no discovery, that's very problematic. What else is problematic? The other problematic piece is finding a good faith belief is inconsistent with what the jury found over and over again, amply supported, which was that they were at a minimum reckless or intentionally encouraging infringement. So I don't think a judge... It's an interesting question, but I don't think a judge in that enhancement part of the analysis is entitled to say someone was acting in good faith when the jury has found in a supported verdict that it was reckless or worse. And you make it... I think you make an additional argument. We're doing a lot of cases this week, but as I recall, you're saying that she should have at least not decided this until the damages trial? Well, yeah. I think that's... And why? I mean, why in a way? I mean, this is separate and distinct. Because the read factors bear on how you try the case. I mean, there's so many things that could happen. So your argument is because the trial isn't over and so stuff can go on in the damages trial that might also affect... But she could take care of that in other respects, right? She could always award sanctions or whatever. Theoretically. There's litigate... I mean, you're talking about litigation. But with the enhanced damages, I don't think that's true. I think you need to know how much has been awarded before you do that, right? I mean, I think you need... You get $1 and the judge thinks that... I just think that it was premature. If you get $1, what's she going to do? Give you $3 and you'll be happy? Good point, Judge Moore. So I think... I understand instinctively what you're saying about, yeah, if it's... If your hope was is if the judge thinks it's at the low end, she'll be more inclined to enhance the damages. But there's no legal principle on which we can rest to... What about prejudgment interest? Prejudgment interest, I think, is just a slam dunk. I mean, the amount that was awarded was a fixed amount based on a negotiation in 2000. That was the hypothetical negotiation date. The jury consciously did that. It was right in the verdict form. And you're entitled... And the Supreme Court in General Electric said you're entitled to interest from the date of negotiation. If the issue is that there's a windfall of the time value of money, which has to be... Yeah, but the liability here didn't start to run till years later. I mean, how can you... I mean, that's... But if you're negotiating in 2000 about future liability that you know about and you say, I'll give you X amount on date A for what I end up doing in date Z, there's ample opportunity to take into account the time value of money and people do it all the time. I mean, that's what a lump sum is. When you agree to a lump sum, you say, well, I'm doing this, but this is how it affects the time value of money. I think that's what people always... That's what I do when I'm in court on that issue. And so if there's a time value of money issue, that should be related. But if I say to you, I'm going to give you a dollar on date A for what I do in date Z, then I get interest from that date. And if they think that it's unfair that you have the dollar for 17 years or 20 years or whatever it is, then it's incumbent on them to say, well, they're going to be getting... You're giving me money 20 years before it happens. I should get credit for that. All right. Thank you very much. Thank you. We'll restore a minute, assuming that they get to the cross appeal. Thank you. Restore some time. Give you four minutes. Thank you, Your Honor. A few words about enablement. I don't understand the plaintiffs to be rejecting the suggestion that Dr. Piner's testimony on the mono on amorphous was conclusory. I take them instead to be saying that we somehow had a responsibility to make him be more specific through the cross examination. In fairness, they're also mushed up in that is that you all have the burden. They don't have the burden. That's true. Even if they had no witness saying anything, that's not the be all and end all. It's a question of what you did, not what they did. That's fair enough. What we did is we put on an expert who testified in quite a lot of detail about the griddle effect and other things about other reasons why this wasn't enabled. Their response with respect to these particular objections with respect to this particular version of the device was just simply conclusory. It did not lock horns with the argument that was made. As a consequence, I think we did sustain our burden of proof. Let me see if I can summarize it. You put on an expert that says, this can't be grown this way. The way disclosing the specification does not work in this one of six embodiments or one of three embodiments, whichever way to go. Look, here are all the reasons why it doesn't work. Then they put on two people that said, we were able to do it, now four and six years later or whatever. Who has the burden of showing whether experimentation is undue or not? I think it's ultimately probably our burden in order to show invalidity, but we testified directly about the degree of experimentation being undue. In fact, Dr. Fitzgerald testified at the time of the invention, it wasn't possible through any means to do this, that the means that were used subsequently were developed subsequently. That's the only relevant question with respect to- It's hard to prove a negative too. You're absolutely right and I couldn't agree. The it's a little tricky to figure out what the burden is, how you satisfy that burden. I think we did enough here that their silence with respect to this critical issue is not enough to let them escape the invalidity. With respect to claim construction- Stop, you're going to win or lose on enablement. It's one of six or one of three, and that doesn't matter under the law as far as I'm concerned. Don't bother with how I want to decide the case. You say it wasn't possible through any means, your expert says that, and they put on evidence that says, well, we were able to do it. Here are two different people that were able to do it. How do we know- Your expert said it wasn't possible through any means. Did he address in rebuttal the way that they did it, or did you dive into the way that they did it? How do I know the way they did it was undue or wouldn't have known by a posita at the time? Well, number one, Dr. Piner didn't say at all how he did it. I don't think it was our burden to go back and prove what only he would know. The burden, why didn't you ask him? Well, I don't have a good answer for that. Perhaps we should have, but what you end up with is testimony that Dr. Piner saying, look, there are reasons in physics why you can't do it the way the patent teaches. Their response isn't that. No, in fact, you can follow the patent. They only say, they assert that you can follow the patent and do it. They don't explain how, and the only time they explain anything about how is with respect to things that they've done years after the patent through methods they don't even claim were taught in the patent. I think that that's simply not enough in light of Dr. Fitzgerald's- They don't say they were taught in the patent, but I need to know whether they were known to a skilled artist at the time. I think it's fair to assume that if they were known to the skilled artisan at the time that they would have said that. Dr. Moustakis had a very good incentive to say that because we had this written description argument that said that he didn't possess this version of the device at the time. As a consequence, his failure to even claim that he made it at the time using the methods disclosed in his patent, I think is very significant evidence that it wasn't enabled. My time is up. Thank you. In the absence of a response to the cross appeal, we'll just rest on the case. Thank you. We thank both sides and the case is submitted.